**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**PETER D. LINGNOFSKI,**

**Plaintiff,**

**v.** **Case No. 25-CV-1272-SCD**

**FRANK J. BISIGNANO,**
***Commissioner of the Social Security Administration,***

**Defendant.**

---

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**

---

Peter Lingnofski seeks social security benefits based on a host of physical ailments that he says caused significant difficulties with lifting, standing, and walking (among other limitations). After a hearing, an administrative law judge denied the claim for benefits, finding that Lingnofski's impairments did not significantly limit his ability to perform basic work activities. Lingnofski seeks judicial review of that decision under section 205(g) of the Social Security Act, arguing that substantial evidence does not support the ALJ's findings that his headaches and lower extremity edema were not severe impairments and that the ALJ erred by failing to consider the combined effects of all his impairments. Because Lingnofski has not shown reversible legal error, and because the ALJ's decision is otherwise supported by substantial evidence, I will affirm the denial of disability benefits.

**BACKGROUND**

Lingnofski applied for disability insurance benefits under Title II of the Social Security Act, claiming that he was unable to work due to various physical ailments. *See* R. 195–96,

216–29.[1]

## I. Personal and Medical History

Lingnofski was born in Neenah, Wisconsin, in 1964. R. 179. After graduating from high school, he spent many years performing manual labor for a local hospital. *See* R. 198–206, 218, 243–44, 271–72. In 2018, Lingnofski got a new job doing binding and spiraling for a printing company. *See* R. 207–12, 243, 245, 271, 273. He stopped working in July 2021 because he couldn't keep up with the physical demands of the job. R. 54–55, 243, 271. Lingnofski attempted to return to the workforce on several occasions, but each one was short-lived. *See* R. 243–49, 271–77. He last worked in late 2021. *See* R. 217, 243, 271.

Lingnofski has a long history of medical issues. He was diagnosed with seizure disorder, which was well-controlled with medication, with his last seizure occurring in the early 2000s. R. 376, 611, 1429, 2105. In 2002, Lingnofski underwent a left frontal craniotomy to address multiple brain lesions. R. 328, 331. He suffered a stroke several years later and subsequently received treatment for bladder cancer and prostate cancer, both of which remained in remission. *See* R. 331, 429, 611, 844, 2458.

Aside from those issues, Lingnofski was doing fairly well health wise until he started experiencing headaches in late 2021. R. 611. In January 2022, he reported pounding headaches in the back of his head for the last week and a half. R. 331. He said the headaches kept him up at night and that, when he was able to sleep, he often woke up feeling nauseated and vomiting. A brain MRI revealed a large left parietal lobe cystic lesion. R. 411–12. Nevertheless, a few days after receiving those results, Lingnofski told his treating nephrologist that his headaches were less severe and were tolerable, and he declined pain medication.

[1] The transcript is filed on the docket at ECF No. 13-1.

R. 328. The nephrologist referred Lingnofski to neuroscience, R. 330, and at his initial appointment there, he described having two months of intermittent headache episodes that sometimes lasted a few days, R. 994–95. A follow-up MRI confirmed the cystic lesion. R. 633–34, 693–97.

In July 2022, Lingnofski underwent another craniotomy to remove the new brain lesion. *See* R. 593–606. He was discharged the following day in stable condition and reported doing well several months after the surgery. R. 581–82, 601. But in December 2022, Lingnofski reported that he was still getting headaches about twice a week. R. 907. And he continued to complain about headaches during a neuroscience visit in July 2023. R. 1429–30. Lingnofski described having pounding headaches a few times each week. However, he denied experiencing any other focal neurologic symptoms like vision changes, nausea, or vomiting, and he said he alleviated his headaches by taking a couple of Tylenol and a nap. R. 1429. Lingnofski told the nurse practitioner that he didn't feel any additional intervention was necessary at the time. R. 1430.

Lingnofski also saw a nephrologist for chronic kidney disease and hypertension. *See, e.g.*, R. 328–389. In January 2022, he reported feeling discouraged about being unable to hold down a job and said he wanted to apply for disability benefits. R. 334. The nephrologist told Lingnofski that she didn't think she had enough to justify disability at the time. Lingnofski reported feeling well overall at follow-up visits in May 2022, December 2022, and June 2023, and his nephrological impairments appeared largely controlled and stable with medication. *See* R. 618–24, 907–13, 1432–37.

Things then took a slight turn for the worse. After testing, Lingnofski's kidney disease was upgraded to stage IV, the stage right before kidney failure. *See* R. 779–82. And in August

2023, Lingnofski started complaining about swelling in his legs that extended from his knees to below his ankles, mild chest pain, and gaining more than twenty pounds. R. 1420–29. (He was already severely obese, with a BMI consistently above 35. *See, e.g.*, R. 2367.) A physical examination confirmed the presence of mild edema in both lower legs. R. 1425.

Lingnofski continued to exhibit lower extremity edema and note weight gain at visits in late 2023 and early 2024. *See* R. 1410–19, 2083–89, 2366–73, 2421–2458. He also reported shortness of breath with exertion and said he had difficulty walking his dog around the block. R. 1411, 2084, 2088, 2095. In December 2023, Lingnofski's nephrologist recommended a low sodium diet and prescribed furosemide. R. 2088. Lingnofski told his primary care physician in February 2024 that his edema continued to go up and down since starting the new medication. R. 2458. The physician recommended trying compression socks but said she couldn't increase Lingnofski's water pill due to his kidney disease. R. 2466. A few weeks later, Lingnofski said he had lost only eight pounds since starting furosemide. R. 2422. He also said he noticed that his legs were swollen and that his socks were tight by the end of the day. In April 2024, Lingnofski's primary physician indicated that Lingnofski's kidney disease presented a significant risk of mortality. R. 2373.

Lingnofski also suffered from mild intermittent asthma, lower back pain, and several other health problems. *See* R. 611, 907. In October 2023, he reported using his rescue inhaler nightly and said his asthma had worsened with the recent changes in weather. R. 2105. Lingnofski's primary physician prescribed a once-daily corticosteroid inhaler. R. 2110. Lingnofski reported in March 2024 that he rarely used his rescue inhaler, though he said he sometimes had difficulty breathing when walking his dog. R. 2422. Diagnostic imaging also revealed degenerative changes in Lingnofski's spine. R. 410, 1251–52. At a physical therapy

appointment in January 2023, Lingnofski said his back pain started about a month after his latest brain surgery. R. 808. He reported struggling walking his dog and indicated the pain worsened with prolonged sitting, bending over, and picking up heavy objects.

## II. Administrative Proceedings

Lingnofski applied for disability benefits in December 2021. *See* R. 15, 195–96. He alleged that he was disabled as of November 27, 2021 (when he was fifty-seven years old) due to a traumatic brain injury, IgA nephropathy, kidney disease, high blood pressure, high cholesterol, and exercised-induced asthma. *See* R. 216–29. In his application materials, Lingnofski reported that his impairments caused headaches, dizziness, and lightheadedness. *See* R. 250–57. He also noted his prior brain surgery, ongoing lesions, and possible seizures. Lingnofski said he had no issues with personal care activities; he made simple meals; he performed some household chores like mowing the grass, vacuuming, and doing some laundry; he was able to drive and shop in stores; and he enjoyed watching television. According to Lingnofski, his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and concentrate. He indicated that he could lift up to twenty-five pounds and could walk for less than a block before needing to rest.

Lingnofski's application was denied at the administrative level of review. The state agency charged with reviewing disability applications on behalf of the Social Security Administration first denied Lingnofski's claim upon its review of the available medical records, finding that Lingnofski did not have any severe impairments. *See* R. 72–86. After the state-agency denial, Lingnofski had a hearing with an ALJ. *See* R. 29–71. Lingnofski told the ALJ that he stopped working because his back kept freezing up, and he couldn't keep up with the physical demands of his job. R. 54–55. He estimated that he could lift up to twenty pounds

and stand for about four hours during an eight-hour workday. R. 55–57. Lingnofski indicated that prolonged standing caused his legs to swell, which made it difficult to walk. R. 57–58, 63–64. He said his medication helped only a little bit. Same with elevating his legs, which he did for about an hour every afternoon. Lingnofski also told the ALJ that his legs sometimes gave out while walking, that he used inhalers every day to help with his shortness of breath, that his weight impacted his physical ability, that his kidney disease was getting worse, and that he had memory issues ever since his brain surgeries. R. 46–53, 58–63.

In September 2024, the ALJ issued a written decision finding that Lingnofski was not disabled. *See* R. 12–28. The ALJ considered the disability application under 20 C.F.R. § 404.1520, which sets forth a five-step process for evaluating DIB claims. *See* R. 15–23. The ALJ determined at step two of that process that Lingnofski had several medically determinable impairments, including hypertension, chronic kidney disease, hyperparathyroidism, parietal cystic brain lesion status post craniotomy, seizure disorder, headaches, obesity, laryngopharyngeal reflux disease, asthma, degenerative disc disease of the lumbar spine, edema, and deep vein thrombosis. R. 17–18. However, according to the ALJ, Lingnofski did not have an impairment or combination of impairments that had significantly limited his ability to perform basic work-related activities for twelve consecutive months. R. 18.

In reaching that decision, the ALJ considered Lingnofski's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 18–23. The ALJ first summarized Lingnofski's allegations, observing that he claimed he was unable to work due to physical ailments that primarily affected his ability to lift, stand, and walk. *See* R. 19. According to the ALJ, Lingnofski's statements concerning the intensity, persistence, and

limiting effects of his symptoms were inconsistent with the overall record, which did not show "the serious symptoms and dysfunction that would be expected were [he] as limited as alleged." R. 19. The ALJ then summarized the medical evidence and generally concluded that Lingnofski's impairments caused only transient or mild symptoms and were well-controlled with medication. *See* R. 20–22. Finally, the ALJ explained why he found persuasive the prior administrative medical findings of the reviewing state-agency consultants and the opinion of an examining pulmonologist. *See* R. 22–23. Based on his step-two finding, the ALJ determined that Lingnofski was not disabled at any time from his alleged onset date (November 27, 2021) through the date of the decision (September 11, 2024). R. 23.

The Social Security Administration's Appeals Council denied Lingnofski's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). This action followed. *See* Compl., ECF No. 1.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Lingnofski seeks remand for rehearing, arguing that the ALJ erred in denying his disability claim at step two of the sequential evaluation process.

"The Step 2 determination is 'a *de minimis* screening for groundless claims.'" *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)). "Procedurally, the ALJ is required to determine at step two . . . whether the claimant in fact has an impairment or combination of impairments that is 'severe.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (citing 20 C.F.R. § 404.1520(a)(4)(ii)). An impairment or combination of impairments is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment is 'not severe' only if it is 'a slight abnormality' that has 'no more than a minimal effect on the ability to do basic work activities.'" *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016) (quoting Social Security Ruling (SSR) 96-3p, Titles II and XVI: Considering

Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment Is Severe, 1996 WL 374181, 1996 SSR LEXIS 10, at *3 (July 2, 1996)). Examples of basic physical work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1522(b). The claimant has the burden to prove that an impairment is severe. *Castile*, 617 F.3d at 926 (citing *Zurawski*, 245 F.3d at 885–86).

Lingnofski first argues that substantial evidence does not support the ALJ's finding that headaches were a non-severe impairment. He criticizes the ALJ for not acknowledging that headaches were the symptom that led to Lingnofski's craniotomy in July 2022. Although it's true that the ALJ didn't explicitly make that connection, he did consider the progression of Lingnofski's headaches during the early part of 2022. The ALJ noted that Lingnofski reported experiencing occipital headaches that, as of January 11, 2022, had lasted for a week and a half. R. 21 (citing Exhibit 1F). However, the ALJ also observed that, less than a week later, Lingnofski reported that his headaches were tolerable, and he declined pain medication. *Id.* The ALJ further acknowledged that Lingnofski continued to complain about headaches at follow-up appointments in February 2022 and May 2022. R. 21 (citing Exhibit 3F). Those latter records did not, as Lingnofski suggests, describe headaches worsening in frequency or severity. Rather, Lingnofski's headaches were characterized as "non-intractable," R. 650–55, and it was Lingnofski who claimed his headaches prevented him from working, R. 629.

Ultimately, substantial evidence supports the conclusion that Lingnofski's headaches caused only transient or mild symptoms or associated limitations and were well-controlled with medication. Lingnofski concedes that his headaches improved following the July 2022 craniotomy, as they decreased in frequency from daily (i.e., constant) headaches to only two

a week (i.e., transient). *See* Pl.'s Br., at 7, ECF No. 19 (citing R. 907, 1429). And the ALJ acknowledged that Lingnofski's headaches didn't completely disappear. The ALJ noted that, during a neuroscience visit in July 2023, Lingnofski described having "pounding" headaches a few times a week. R. 21 (citing Exhibit 3F).[2] But the ALJ also noted that Lingnofski denied experiencing other focal neurological symptoms like vision changes, nausea, or vomiting and that Lingnofski said his headaches were alleviated with "a couple of Tylenol" and a nap. *Id.*

Lingnofski insists that the fact he had to sleep off his headaches shows that they were *not* well-controlled with medication and that they *did* interfere with his ability to perform basic work activities. The ALJ, however, did not suggest that medication alone completely controlled Lingnofski's headaches or that Lingnofski's headaches did not cause any limitations. Rather, the ALJ determined that Lingnofski's headaches were not so severe and frequent that they would *significantly* interfere with his ability to work. So while I agree that most employers do not permit daytime siestas, I disagree that the neuroscience visit substantiates Lingnofski's claim of debilitating headaches after his craniotomy. It's safe to say that workers are expected to push through most (i.e., non-intractable) headaches. And no evidence suggests that Lingnofski would be unable to do so consistently throughout a typical workday. After all, he said prescription headache medication was "not needed" months before the craniotomy—when his headaches were supposedly even worse. *See* R. 328.

Lingnofski also argues that substantial evidence does not support the ALJ's finding that his lower extremity edema was a non-severe impairment. The ALJ noted that Lingnofski reported ongoing edema in both legs, cited several instances where swelling was seen on examination, and observed that providers recommended he wear compression stockings. *See*

[2] The visit the ALJ referenced is actually in Exhibit 6F, at R. 1429–31.

R. 18, 22 (citing Exhibits 7F; 8F; 12F). Lingnofski does not accuse the ALJ of misrepresenting that evidence. Instead, he says there was more to the story, including his statements to providers that his edema went up and down, that he gained a lot of water weight over a short period of time, and that by the end of the day his legs were swollen and his socks were tight. *See* Pl.'s Br., at 8 (citing R. 2086, 2200, 2422, 2458).

Substantial evidence supports the conclusion that Lingnofski's lower extremity edema caused only transient or mild symptoms or associated limitations and was well-controlled with medication. The only evidence Lingnofski cites contrary to the ALJ's conclusion consists of his own statements to providers about fluctuating symptoms, weight gain, and swollen legs. The ALJ credited Lingnofski's subjective symptoms to a degree but reasonably found that he was not as limited as alleged. *See* R. 19–23. Crucially, Lingnofski's doctors did not suggest that edema caused any functional limitations whatsoever. In fact, the only doctors who offered a medical opinion about Lingnofski's leg swelling—the reviewing state-agency medical consultants—agreed that Lingnofski did not suffer from *any* severe impairments. *See* R. 74–77, 81–83. The ALJ cited those findings as support for his subjective symptom evaluation. *See* R. 22–23 (citing Exhibits 2A; 3A). The ALJ also cited physical examinations wherein Lingnofski had only 1+ or trace edema—the lowest amount observable. In other words, Lingnofski admitted himself that his edema symptoms were fluctuating, and the objective findings were consistent with mild symptoms. The ALJ's evaluation of Lingnofski's statements therefore was not patently wrong. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014))).

Finally, Lingnofski argues that the ALJ failed to consider all his impairments in combination. When evaluating the severity of a claimant's impairments, the ALJ "must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his . . . activity as if each impairment existed alone." SSR 85-28, Titles II and XVI: Medical Impairments That Are Not Severe, 1985 WL 56856, 1985 SSR LEXIS 19, at *9 (1985). Lingnofski acknowledges, as he must, that the ALJ repeatedly stated that he had considered Lingnofski's impairments in combination when making his step-two finding. *See* Pl.'s Br., at 10 (citing R. 18, 22–23). However, according to Lingnofski, the ALJ merely paid lip service to that promise, as the decision shows he considered the alleged impairments piecemeal. Lingnofski insists that his headaches and lower extremity edema, when considered along with other impairments like obesity and exercise-induced asthma, collectively caused more than a minimal effect on his ability to perform basic work activities.

The ALJ here sufficiently considered the combined effect of all Lingnofski's impairments. The ALJ recognized his duty to consider Lingnofski's impairments in combination, summarized Lingnofski's subjection allegations, and described the objective medical evidence concerning each alleged impairment, including hypertension and chronic kidney disease, hyperparathyroidism, brain lesions, seizure disorder, headaches, obesity, laryngopharyngeal reflux disease, exercised-induced asthma, back issues, and edema and deep vein thrombosis. *See* R. 15–23. Again, no doctor opined that those impairments—whether considered alone or in combination—significantly limited Lingnofski's ability to perform basic work activities. The only evidence Lingnofski offers to prove that he was so

limited is his own statements to providers and the ALJ. But the ALJ thoroughly considered those allegations and explained why he did not fully credit them. *See* R. 18–23.

Lingnofski says the ALJ failed to explain *which* specific statements he rejected and *how* his evaluation led to his step-two finding; I disagree. The ALJ explained that Lingnofski's allegations of "serious symptoms and dysfunction" were inconsistent with the objective medical evidence, which showed that his impairments caused only mild symptoms and were well-controlled with medication. *See* R. 19–22. According to the ALJ, those allegations were also inconsistent with the findings of the reviewing state-agency consultants and the opinion of an examining pulmonologist. *See* R. 22–23. Substantial evidence supported the ALJ's reliance on that evidence. Put another way, Lingnofski cites no evidence compelling the ALJ to find that several of his slight abnormalities (i.e., non-intractable headaches, mild edema, and mild intermittent asthma) caused an outsized impact.

**CONCLUSION**

Substantial evidence supports the ALJ's step-two findings that Lingnofski's headaches and lower extremity edema did not significantly limit his ability to perform basic work activities, and Lingnofski has not shown that the ALJ committed reversible legal error in failing to consider the combined effects of his impairments. Accordingly, for all the foregoing reasons, I **DENY** the plaintiff's request for remand and **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 4th day of September, 2026.

Stephen C. Dries

STEPHEN C. DRIES
United States Magistrate Judge